Lawrence E. BOWLING, Plaintiff,

v.

Kenneth ("Casey") LAWSON,
Defendant.

No. CIV. A. 2:98–1158.

United States District Court,
S.D. West Virginia,
at Charleston.

June 21, 2000.

*FINDINGS OF FACT CONCLUSIONS
OF LAW*

COPENHAVER, District Judge.

Pursuant to the evidence adduced at the trial on May 30 and 31, 2000, the court makes the following findings of fact, by a preponderance of the evidence, and the following conclusions of law.

The plaintiff, Lawrence E. Bowling, Phd., age 84, is a former professor of English living in Berea, Kentucky. In September, 1996, he married Ethel Robinson McClave, a widow then 79 years of age and a lifelong resident of Charleston, West Virginia.

In October, 1997, Ethel McClave Bowling suffered a heart attack at their home in Berea. She underwent a by-pass operation and required a second surgical procedure three days later. While she was hospitalized, Lawrence Bowling was detected in an act that Ms. Bowling then thought was an effort to tamper with her life-support equipment in order to take her life. The view that Lawrence Bowling had so tampered with her life-support equipment was shared by Mrs. Bowling with her nurses who reported it to Jan Overstreet of the hospital staff at Central Baptist Hospital in Lexington, Kentucky. Lawrence Bowling sued Jan Overstreet in Kentucky state court, as well as two of Mrs. Bowling's children, for defamation,

joining the hospital and four others in the suit as well. Having lost at the trial level, Lawrence Bowling now has the case on appeal.

When Mrs. Bowling left the hospital, she came to Charleston to recuperate at the home of her daughter, Jane McClave Lawson, who had helped manage her affairs. She remained in Charleston until February 1998 when she returned to Berea to live with Lawrence Bowling. She was to remain there until June 8, 1999, when she returned to her own home of many years on Quarrier Street in Charleston where she has remained.

Mrs. Bowling's children, Jane Lawson and David McClave, were highly suspicious of the motive and intent of Lawrence Bowling in his relationship with their mother, particularly after the hospital tampering incident of which they had immediately learned and as a consequence of which they saw that Mrs. Bowling was not again left alone in the hospital with Lawrence Bowling. Adding to their concern was their awareness of Lawrence Bowling's efforts at the hospital to get Mrs. Bowling to sign a document assigning her assets to him should she predecease him and to obtain the signature of her brother as a witness to it after leading her brother to believe that it was merely permission that he be buried in the McClave family plot. Of further concern were such things as Lawrence Bowling's absence during her hospital stay at a time when it was left to Jane to make the decision to go forward with the second operation. During the day and a half that Lawrence Bowling was absent, he was encountered in Charleston in Mrs. Bowling's Quarrier Street home. He was there, he said, to get her blue dress in which he said she wished to be buried, all of which was contrary to the arrangements that had already been made with a Charleston funeral home for her cremation upon her death. Both on that occasion and at the hospital, Lawrence Bowling was heard to say that he did not want Mrs. Bowling's children to get any of her property.

Mrs. Bowling's family was also concerned that Lawrence Bowling owned several firearms, was known to carry concealed weapons on his person and on at least one occasion had brought firearms to the Quarrier Street residence. Knowing that Lawrence Bowling was from time to time armed, Mrs. Bowling and members of her family feared him.

The defendant, Kenneth "Casey" Lawson, is the son of Jane McClave Lawson and is the grandson of Mrs. Bowling who helped raise him from the time he was 13 years old. Casey Lawson is now 26 years of age and is an undergraduate student at West Virginia University, as he was on December 16, 1998, when the events occurred that are the subject of this lawsuit.

When the McClave family members gathered for Thanksgiving dinner in November 1998, both Mrs. Bowling and Casey, along with Jane and David, were present. Casey Lawson learned from his uncle David for the first time of the events that had transpired at the time of Mrs. Bowling's hospitalization. He learned about them as well from Mrs. Bowling who related the hospital equipment-tampering threat on her life, which she had thought was motivated by a desire to obtain her property, and threats against other members of the family. Soon thereafter, on December 7, 1998, Lawrence Bowling instituted this suit against Jane and David and an attorney, John Lutz. It is noted that Casey Lawson, who is now the sole remaining defendant after all others in this case were dismissed on motions to dismiss and for summary judgment, was not made a party until after the events related below.

Jane, a divorced school teacher, called Casey in Morgantown to inform him about the suit. It was the second time she had been sued by Lawrence Bowling, the first suit having been filed and dismissed in Kentucky state court as earlier noted. Jane, a diabetic, was highly distraught

about being sued again. Her emotional state was driving up her blood sugar and she was crying when speaking to Casey about the lawsuit.

Early the next morning, Casey Lawson took it upon himself to telephone the Bowling residence in Berea at 7:32 a.m. He spoke primarily to his grandmother whom he berated repeatedly for the filing of this second suit against his mother, although Mrs. Bowling was not a party to the suit. Lawrence Bowling was on the line listening to the conversation when Casey Lawson asked to speak to him. According to the tape that Lawrence Bowling was making of the call, the conversation then proceeded as follows:

Defendant: Put him on the phone.

Mrs. Bowling: He's probably already on the phone.

Plaintiff: I am on the phone.

Defendant: Are you listening to me?

Plaintiff: I am on the phone, Casey.

Defendant: You son-of-a-bitch.

Plaintiff: You little son-of-a-bitch, you stay off this damn phone.

Defendant: Mother-f ____er, listen to me, you are not suing me.

At that point, it appears from the tape that Lawrence Bowling hung up his phone while the conversation continued between Casey Lawson and Mrs. Bowling until Lawrence Bowling took the phone from her and hung it up.

In reality, the tape in evidence, offered by Lawrence Bowling, omits the further conversation that took place between Casey Lawson and Lawrence Bowling. It is not certain exactly what words are attributable to the two of them. Mrs. Bowling testified that the omitted portion is as follows:

Defendant: Dr. Bowling, you're killing my mother

Plaintiff: Kill your mother hell

Lawrence Bowling played the original tape for Mrs. Bowling twice that same day and she heard then the words, now omitted, to which she has testified. Later, after her June, 1999 return to Charleston, Lawrence Bowling played the tape again in her presence around December, 1999. She noticed that the tape omitted the portion to which she has testified but agreed, at Lawrence Bowling's urging, to sign an affidavit which he then presented to her for her signature, attesting to the accuracy of the tampered tape, because Lawrence Bowling's hand movements within his coat pocket left her apprehensive that he was armed and she feared for her safety should she not agree.

Casey Lawson has given differing versions of what Lawrence Bowling said in response to Casey's statement that he was killing his mother. Casey Lawson has testified that, after he had told Lawrence Bowling that "You're killing my mother by doing this," Lawrence Bowling immediately replied, "I'll kill your mother, hell." Later in his testimony, Casey Lawson says instead that he heard Lawrence Bowling utter the word "kill" and that he thought Lawrence Bowling had made a threat against the life of someone, saying " 'I'll kill you' or 'I'll kill her' or 'your mother' . . . something."

Because Lawrence Bowling has altered the original tape in a manner that omits a critical portion of the conversation, it is unlikely that an exact statement of the words uttered will ever be known. The court finds that the omitted portion substantially consists of the statement by Casey Lawson to Lawrence Bowling that he is killing his mother and Lawrence Bowling's reply of "Kill your mother hell." Casey Lawson understood the reply, particularly in light of the information just learned by him at Thanksgiving, to be a threat to kill his mother.

After completion of the 7:32 a.m. call, Casey Lawson went on to class to take a final exam at 8:30 a.m. As soon as he finished, he placed a telephone call to the Berea Police Department at 9:30 a.m. The call was recorded, a copy of the tape of it is in evidence and the court has had its

court reporter transcribe the tape. The transcription is accurate and is made a part of the evidentiary record of this case.

Casey Lawson is heard in that telephone conversation to say that Lawrence Bowling made the statement to him in their earlier telephone conversation that morning as follows:

> I'm going to kill you and I'm going to kill her—kill her, you son of a bitch.

Casey Lawson then added:

> And then at that point he said, "It's all mine." I don't know what he's talking about, ma'am, but I'm scared for my grandmother's welfare.

\*　　\*　　\*　　\*　　\*　　\*

I think she is in some kind of danger.

The recipient of the call at the Berea Police Department advised that they could do a welfare check but could not take her from the household if she did not wish to leave. An officer was promptly dispatched to the home where he learned that Mrs. Bowling was secure, as Casey Lawson in turn learned when he called back, as the recipient of his earlier call had suggested, to the Berea Police Department later that same day.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

▮ The law of Kentucky, which applies here, prescribes the elements of a claim of intentional infliction of emotional distress. Those elements consists of an intentional act, outrageous in nature, that causes severe emotional distress.[1]

▮ Lawrence Bowling claims he has sustained severe emotional distress by virtue of the telephone calls by Casey Law-

son to his home and the Berea Police Department on December 16, 1998, and the subsequent visit that same day by the police officer to his home. His evidence in support of his claim of severe emotional distress consists of his testimony that he was made sick by those events, was hospitalized in the emergency room on one occasion, has developed hives over all of his body including the top of his head and under his long hair which covers the back of his neck, and has been unable to do research and writing for books that he was authoring on two plays of Shakespeare due to worry that he would be the first suspect in the event something happened to a member of Lawson's family.[2]

Lawrence Bowling fails, however, to substantiate any claim of emotional distress beyond his self-serving declarations just noted. He furnishes no medical evidence of sickness, no hospital bill for services, and displays no evidence of hives and, indeed, no hives were visible at trial on any part of his face, head, neck or hands that constituted the only parts of his body then visible. The defendant's statement that he has been unable to do research and writing on Shakespearean plays due to worry is belied by the quality of the research and writing he has undertaken as a *pro se* litigant in this case. His pleadings, motions, responses, memoranda and argument reflect his ability to focus and concentrate and to effectively analyze and cogently convey his view of the applicable principles at issue throughout the entirety of this case which has involved a good deal more than the claim against Casey Lawson. The court finds that the bare testimony of Lawrence Bowling relating to his claim of physical illness and

---

1. *Craft v. Rice*, 671 S.W.2d 247, 249 (Ky. 1984). *See also* court's order of March 23, 2000; *Wymer v. J.H. Properties, Inc.*, No.1998–CA–00986–MR, 1999 WL 731591, at \*6 (Ky.App. Sept.17, 1999) (The court notes that this case is currently pending before the Supreme Court of Kentucky on a petition for discretionary review. If the petition is granted, the opinion may be withdrawn).

2. As the Chief of Police of Berea testified, Lawrence Bowling would in such event be a suspect anyway, absent circumstances pointing in a different direction, simply because of the family relationship. Of course, the events surrounding the hospitalization of Mrs. Bowling in October, 1997, would doubtless further mark him as a suspect.

accompanying severe emotional distress is not credible. There being no other evidence to support his claim of severe emotional distress, his claim for intentional infliction of emotional distress is not proven.

### DEFAMATION–SLANDER

■ A claim of slander under Kentucky law arises from the publication of a false statement that is oral, defamatory and unprivileged. In addition, there must be shown either that injury to the plaintiff's reputation was thereby caused or that the words themselves are actionable such as where, as here, they imply a crime or impute criminal conduct to the plaintiff.[3]

■ Casey Lawson advised the Berea Police Department that Lawrence Bowling had, in a telephone conversation earlier that day, threatened to kill him and kill "her." It is not entirely clear whom he meant by "her;" that is, whether the reference was to his mother about whom he had just stated that Lawrence Bowling's lawsuits were "running my mother into the ground" or whether he was making reference to his grandmother about whom he said "I am scared for my grandmother's welfare" and "I think she is in some kind of danger." As to the earlier telephone conversation, the court has found that the use of the word "kill" by Lawrence Bowling related to Casey Lawson's mother.

Casey Lawson's telephone call to the home of Lawrence Bowling and his grandmother early on December 16, 1998, appears to have been prompted by anger that his grandmother would continue to consort with Lawrence Bowling who was creating so much grief, even physical injury, to his mother by frivolous lawsuits against her and the family. His anger doubtless was fueled by his awareness of all of the events that surrounded the hospitalization of his grandmother. His grandmother, however, had returned to live with Lawrence Bowling in Berea eleven months earlier and there was no indication that she was then in any immediate danger at the hands of Lawrence Bowling. Consequently, defendant's call to the Berea Police Department two hours later expressing concern that his grandmother was in some kind of danger and that he wanted her "out of there" was not a rational view of the circumstances at that time. The policeman who was dispatched to make a routine welfare check on the grandmother quickly found that she was safe and the matter was not further pursued.

Applying the law of Kentucky, a claim of slander requires the publication of a false statement that is oral, defamatory and unprivileged. Casey Lawson's statement to the Berea Police Department was that Lawrence Bowling had told him by telephone earlier that day: "I am going to kill you and I am going to kill her—kill her, you son-of-a-bitch." Casey Lawson's statement that Lawrence Bowling told him he was going to kill him was not true. Insofar as Casey Lawson's statement that Lawrence Bowling had said he was going to "kill her" can be said to relate to Casey Lawson's mother, the court finds that Lawrence Bowling, by his choice of words on that occasion coupled with his conduct on earlier occasions, gave Casey Lawson to believe that Lawrence Bowling was a threat to kill his mother. Indeed, the accuracy of Casey Lawson's interpretation is entitled to some deference and weight by virtue of the alteration of the tape by Lawrence Bowling who thereby sought to extinguish forever the damning words that Lawrence Bowling had uttered in that respect.

Insofar as that same phrase, "kill her," can be said to relate to the grandmother, it was untrue. The fact that Casey Lawson had been made aware that Lawrence Bowling had threatened his grandmother's life by tampering with her life support

---

**3.** *Columbia Sussex Corp. v. Hay,* 627 S.W.2d 270, 274–75 (Ky.App.1981). *See also* court's order of March 23, 2000; *Wymer v. J.H. Properties,* 1999 WL at *4–5.

equipment when she was hospitalized fourteen months earlier does not render his statement true. Thus, the assertion by Casey Lawson to the Berea Police Department on December 16, 1998, that Lawrence Bowling earlier that day had said that he was going to kill his grandmother or that she was in any danger requiring the immediate attention of the police, was not true. Accordingly, to the extent that Casey Lawson's statement asserted that Lawrence Bowling had said that he was going to kill either Casey Lawson or his grandmother or both, the statement was false and so, too, was the implication that his grandmother was in immediate danger at the hands of Lawrence Bowling.

Consequently, there is shown here the publication by Casey Lawson of a false statement that is oral and defamatory. It is also unprivileged because there was no reasonable or good faith basis for reporting to the Berea Police Department that which was simply untrue. Inasmuch as the false statement by Casey Lawson implies a crime and imputes criminal conduct on the part of Lawrence Bowling, being that of "terroristic threatening" to kill another, a misdemeanor under Kentucky law (K.R.S. § 508.080), the words themselves are actionable and constitute slander *per se*.[4]

## DAMAGES

■ In considering the issue of compensatory damages, no damage to the reputation of Lawrence Bowling has been shown to have resulted from Casey Lawson's telephone call to the Berea Police Department. The subject matter of his call was briefly noted in the log of calls made that day and the call itself was tape recorded but that recording was only obtained as a result of its need in this lawsuit. The investigation ended as quickly as it began when a lone policeman was promptly dispatched to make merely a routine welfare check and found Mrs. Bowling safe and secure. Nothing more has come of the call than this lawsuit—brought by Lawrence Bowling and pending in West Virginia, not Berea, Kentucky.

Over a period of many years Lawrence Bowling has largely isolated himself from others by virtue of the countless lawsuits that he has filed against those with whom he has come in contact.[5] All of those suits have been filed by him *pro se* at little expense to him. However, considerable cost and expense has doubtless been visited upon those who have been required to defend themselves by engaging counsel in their behalf. Every suit has ultimately failed except for his claim that he recovered a sum of money or refund from the Internal Revenue Service in one suit and unpaid rent from a tenant in another. Indeed, Lawrence Bowling acknowledges that his reputation had already been badly damaged by the published remarks of public officials, including a prosecuting attorney who charged that he had forged the name of another individual to a document and a state court circuit judge who described him from the bench as being from the "lunatic fringe." Lawrence Bowling sued in state court those individuals and others for defamation, including two newspapers wherein articles quoted references to him as a fool and an idiot or, as he says, something to that effect. That case has been dismissed and is now pending on appeal. Lawrence Bowling also acknowledges that he has been defamed by still

4. The court concluded in its orders of March 23, 2000, and April 21, 2000, that a libel claim under Kentucky law had not been shown. Had it been, the result, including damages, would have been no different than that for slander here.

5. Even now, the filing of suits goes on. After the trial in this case, Lawrence Bowling filed a motion for leave to file an amended complaint adding Mrs. Bowling as a defendant to this action. Lawrence Bowling warned Mrs. Bowling before the trial that "If you go up there and say anything against me and you testify for Casey, I will sue you for everything you've got." The court has this day denied the motion to file the amended complaint as facially frivolous.

others whom he has sued for defamation, one as long as 25 years ago and two others as recently as 1998 and 1999. The Chief of Police of Berea recognizes that others know to be careful what they say around Lawrence Bowling "or he will sue you." Several doctors in Kentucky became afraid to serve Mrs. Bowling and abandoned her as a patient for the same reason. Former friends avoid him for that very same reason. His admittedly badly damaged reputation has not been shown to have been worsened by Casey Lawson's call.

Nevertheless, under slander *per se*, the very nature of the defamatory utterance is presumptive evidence of injury to reputation and of ill will that is sufficient to support an award of punitive damages. *Columbia Sussex Corp.*, at 274.

The court has found that Lawrence Bowling's claims of sickness, hives and inability to undertake research and writing due to worry that he may be a suspect in the event of death or injury to Casey Lawson or his family are not credible. *Infra* at 10–11. The court does nevertheless find that Lawrence Bowling has suffered a moderate degree of mental anguish and humiliation as a result of the defendant's slanderous statement, entitling him to general damages which the court awards in the amount of $500.00.

The court denies an award of punitive damages, no claim for which has been advanced in plaintiff's portion of the pretrial order filed May 2, 2000, or at trial. Moreover, even if punitive damages were otherwise appropriate, the compensatory damages award alone is ample to punish Casey Lawson for his conduct, particularly inasmuch as the evidence shows him only as an impoverished college student. Consequently, a further sum for punitive damages is not allowable in any event.

6. The court notes that the filing fee was paid at the time this action was instituted when the defendant Kenneth ("Casey") Lawson was not a party, he having been added by an amended

*ORDER*

It is accordingly ORDERED that the plaintiff, Lawrence E. Bowling, recover of and from the defendant, Kenneth ("Casey") Lawson, the sum of five hundred dollars. Each party shall bear his own costs.[6]

The Clerk is directed to forward copies of this order to counsel of record and to the *pro se* plaintiff, Lawrence E. Bowling.

complaint along with Mrs. Bowling's brother, Hildreth ("Jerry") Robinson. It is also noted that no depositions have been taken in the case at the instance of the plaintiff.